**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,                         Crim. No. 13-22 (PJS/JJK)

            Plaintiff,

v.

                                        **REPORT AND RECOMENDATION**

David Judin Greer,

            Defendant.

---

Clifford B. Wardlaw, Esq., Assistant United States Attorney, counsel for Plaintiff.

James S. Becker, Esq., Assistant Federal Public Defender, counsel for Defendant.

---

## INTRODUCTION

The District Court has referred Defendant's Motion to Suppress the Fruits of an Unlawful Search and Arrest (Doc. No. 23), and Motion to Suppress Statements (Doc. No. 24), for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1. On March 8, 2013, this Court held a hearing on Defendant's motions, at which Special Agent David Walden of the Federal Bureau of Investigation ("FBI") testified for the Government. As discussed below, based on the motions, the testimony and evidence presented at the March 8, 2013 hearing, the parties' post-hearing submissions, and on all the other proceedings in this case, this Court recommends that Defendant's motions be denied.

**FACTS**

The Government has charged Defendant David Judin Greer with having committed armed bank robbery and brandishing a firearm during a crime of violence, i.e., the bank robbery, for events that transpired on December 13, 2012. (Doc. No. 9, Indictment.) The Government alleges that in the afternoon of December 13, Defendant entered a bank, approached the teller counter, displayed a firearm to a teller, demanded the teller place cash into a white plastic bag, and after receiving several bills in small denominations, fled from the bank. (Doc. No. 1, Aff. of David Walden Attached to Compl. ("Walden Aff.") ¶ 5; Gov't's Hr'g Ex. 1 at 2–3.) After an anonymous caller identified Defendant as the robber seen in surveillance images, Special Agent Walden and his partner Special Agent John Gainer began conducting surveillance of Defendant's suspected residence, but could not confirm that Defendant was there. (Walden Aff. ¶¶ 8–9.)

A few weeks later, the FBI received a call from an officer with the Saint Paul Police Department that Defendant had been taken to Regions Hospital in Saint Paul for a "welfare check" after Defendant made statements about suicidal and homicidal thoughts to a family member. (Walden Aff. ¶ 10.) At the March 8, 2013 hearing before this Court, Special Agent Walden testified that he went to Regions Hospital to speak with Defendant. (Doc. No. 30, Hr'g Tr. ("Tr.") 8:2–9.) On January 2, 2013, Special Agents Walden and Gainer spoke with hospital staff and learned that Defendant had been making statements implicating himself in the December 13 bank robbery. (Tr. 15:24–16:4; Gov't's Hr'g Ex. 1 at 1; Walden

Aff. ¶ 11.) Special Agent Walden also spoke with hospital staff about Defendant's mental status, and the staff assured Walden that Defendant was not medicated in any way and did not suffer from any mental health issues. (Walden Aff. ¶ 11; *see also* Tr. 22:8–17 (indicating that Walden asked Defendant if he was on any medications, to which Defendant said "No").)

Special Agents Walden and Gainer decided to interview Defendant while at Regions Hospital. They first asked Defendant for some identifying information, and then, before any further questioning, they advised him of his *Miranda* rights by reciting the list of rights on the official FBI "Advice of Rights" form. (Tr. 12:1–8; Gov't's Hr'g Ex. 3 (including *inter alia* advice of right to remain silent, right to talk to a lawyer, right to have a lawyer with him during questioning, and to have a lawyer provided if he could not afford one).) Defendant told the agents that he understood his rights as they had been read to him and signed the form indicating that he was waiving his rights and was willing to answer questions without a lawyer present. (Tr. 12:5–7; Gov't's Hr'g Ex. 1; Gov't's Hr'g Ex. 3.) Defendant answered a number of questions by the FBI agents and implicated himself in the December 13 bank robbery by discussing his motives for and involvement in the bank robbery. (Gov't's Hr'g Ex. 1 at 2–4.) The agents conducted the interview in a conference room at Regions Hospital, and Defendant was not restrained during the interview. (Tr. 23:16–24:1.)

At the conclusion of the interview at Regions Hospital, Defendant told the agents that he wanted them to seek out the consent of the owner of the house

3

where he lived to search for the clothing he had worn during the bank robbery in the basement where his bedroom was located. (Gov't's Hr'g Ex. 1 at 4.) The agents advised Defendant of his right to refuse his consent to the search, and Defendant signed an official FBI "Consent to Search" form describing the location to be searched and indicating that he voluntarily gave the agents permission to search that location. (Gov't's Hr'g Ex. 6.) The agents did not place Defendant under arrest at that time. (Tr. 16:12–13.) Special Agent Walden described the entire encounter at the hospital as calm and cooperative. (Tr. 16:24–17:2.)

    Special Agents Walden and Gainer then went to Defendant's residence and were greeted by his roommate, the homeowner. (Walden Aff. ¶ 13.) The homeowner also consented to the search and signed an additional FBI "Consent to Search" form permitting the agents to search the basement of the residence to look for evidence used during the December 13 bank robbery. (Walden Aff. ¶ 13; Gov't's Hr'g Ex. 5.) During that search, the agents located and seized a BB gun, which Defendant had described as having been used during the bank robbery, and clothing that matched the description of the clothes worn by the suspect during the robbery. (Walden Aff. ¶ 13; *see* Gov't's Hr'g Ex. 9 (describing clothing and BB gun acquired on January 2, 2013 during consent search).) Later in the evening of January 2, 2013, the agents received a telephone call from a friend of Defendant who stated that on December 30, 2012, Defendant had admitted to having used a "real gun" rather than a BB gun during the robbery. (Walden Aff. ¶ 14.) The friend said that the weapon actually used during the robbery was

4

hidden in the ceiling panels of the basement within Defendant's residence. (Tr. 9:2–16; Walden Aff. ¶ 14.) Special Agent Walden then coordinated with Special Agent Garner and another FBI agent to retrieve the weapon, which they did on the same day, January 2, after again receiving consent from the homeowner. They located a fully loaded .38 caliber revolver hidden carefully above some duct work in a common area of the basement. (Tr. 9:11–16; Gov't's Hr'g Ex. 7 (consent to search form); Gov't's Hr'g Ex. 9 (describing recovery of a .38 caliber Amadeo Rossi – Inter Arms revolver); Walden Aff. ¶ 15.)

At some point after the FBI agents' first interview with Defendant at Regions Hospital, Defendant was arrested and taken to Ramsey County Jail. (*See* Tr. 25:20–26:7 (indicating that Defendant was under arrest at the time the agents encountered him at the Ramsey County Jail).) On January 4, 2013, Special Agents Walden and Gainer went to Ramsey County Jail to speak with Defendant a second time. (Tr. 17:3–5; Gov't's Hr'g Ex. 2.) Before asking Defendant any questions, the agents again advised Defendant of his *Miranda* rights using the same official FBI "Advice of Rights" form they read to him before their January 2 interview. (Tr. 12:9–13; Gov't's Hr'g Ex. 2 at 1; Gov't's Hr'g Ex. 4.) Again, Defendant told the agents that he understood the rights that they read him, agreed to speak with the agents without a lawyer present, and signed the form indicating his consent to do so. (Gov't's Hr'g Ex. 4; Gov't's Hr'g Ex. 2.) After agreeing to speak with the agents further about the robbery, Defendant admitted to having lied about using a BB gun during their previous interview and

5

he admitted that during the bank robbery he used the .38 caliber revolver the agents had recovered from the basement. (Tr. 26:8–27:1; Gov't's Hr'g Ex. 2 at 1–2.) After the interview concluded, Defendant was transported to his initial appearance in federal court and was then released into the custody of the United States Marshal Service. (Gov't's Hr'g Ex. 2 at 2.) Special Agent Walden described the January 4 meeting as calm and cooperative, although he suggested the meeting was slightly less calm than the interview two days earlier because in the latter interview the agents were confronting Defendant with the fact that he had been dishonest with them about the gun used in the robbery. (Tr. 17:8–15.)

## DISCUSSION

### I. Defendant's Motion to Suppress Fruits of Illegal Search and Seizure

#### A. Legal Standard

In support of his motion to suppress evidence, Defendant argues that his purported consent to the search of his basement apartment on January 2, 2013, was involuntarily obtained. He contends that he did not give his consent voluntarily based on the following: (1) Special Agent Walden did not repeat *Miranda* warnings before obtaining his signature on the form; (2) Walden was not familiar with Defendant's prior arrest history at the time Defendant signed the consent form; (3) Walden filled out the consent form rather than Defendant; and (4) Walden failed to inquire into Defendant's mental health despite knowing

6

Defendant was in the psychiatric ward of Regions Hospital for various concerns with his mental health. (Def.'s Mem. 4–5.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[W]arrantless searches of a home are impermissible absent consent or exigent circumstances." *Steagald v. United States*, 451 U.S. 204, 216 (1981). When the government attempts to justify a warrantless search of a home on the basis of consent, the government bears the burden of proving by a preponderance of the evidence that the consent to search was voluntarily obtained. *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011). A district court considers the totality of the circumstances in determining whether an individual's consent was voluntary. *See id.* Courts in the Eighth Circuit consider the following factors when determining whether a person has voluntarily consented to a search: (1) the person's age; (2) his general intelligence and education; (3) whether he was intoxicated when he allegedly gave consent; (4) whether he consented after being informed of his *Miranda* rights; and (5) whether he was aware of his rights and protections due to previous arrests. *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008). Courts also consider: (1) the length of any pre-consent detention; (2) whether officers made any threats, promises, or misrepresentations; (3) whether the person was in custody at the time of the alleged consent; (4) whether the consent occurred in public; and (5) whether the person was silent when the search was

7

conducted. *Id.* at 676–77. These factors are valuable and guide a court's analysis, but they are not mechanically applied. *Id.* at 677.

## B. The First Search

Considering the totality of the circumstances under which Defendant gave his consent to the initial search on January 2, 2013 in this case, this Court concludes that he voluntarily consented to the search of his basement apartment and that his Fourth Amendment rights were not violated. Defendant is an adult. There is no evidence that he was under the influence of any alcohol or drugs, or otherwise impaired, when he signed the consent form. Defendant actually suggested that the agents obtain the consent of his roommate, the homeowner of the residence where Defendant lived, to search his basement apartment. He was also cooperative and calm throughout the encounter, and the Government showed at the evidentiary hearing that the FBI agents never raised their voices, did not draw or even display their weapons during the interview that preceded Defendant's consent, and never threatened or otherwise coerced Defendant into signing the consent form. *See Vinton*, 631 F.3d at 482 (requiring some showing of coercive police activity to determine that a person's consent was involuntary). Defendant was not restrained during the encounter leading up to his consent, and he appeared rational to Special Agent Walden during the entire encounter. These circumstances show that Defendant's decision to sign the consent form and tell the FBI agents that they could search his residence if they also obtained the consent of the homeowner was the "product of a free and deliberate choice

8

rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Defendant argues that his consent was not voluntary based on evidence of Emergency Department records from Regions Hospital showing that he was admitted to a psychiatric ward for a seventy-two-hour hold. Those records show that Defendant was admitted to the psychiatric ward due to the hospital staff's concerns that Defendant suffered from possible psychosis, depression, developmental disability, and mild mental retardation, among other mental health issues, and Defendant was finally diagnosed as having a likely adjustment disorder. (Def.'s Hr'g Ex. 1 at 2, 4.) However, the preponderance of the evidence shows that Defendant had the requisite mental capacity to consent. For example, Special Agent Walden, who has a bachelor's degree in psychology and a master's degree in industrial psychology, and extensive experience working with people suffering from mental illness and mental deficiencies, testified at the hearing that Defendant had a good vocabulary and was able to convey his thoughts well to the FBI agents. Defendant calmly answered the agents' questions in a rational manner and discussed his motives for and involvement in the bank robbery. Special Agent Walden also testified that Defendant did not exhibit any level of diminished capacity during his investigation and he never had any concerns that Defendant had a developmental disability. (Tr. 21:15–22:12.) The record also reflects that although Defendant did attend "some learning disabled classes," he received a "regular diploma from the school

9

without special circumstances." (Gov't's Hr'g Ex. 1 at 1–2.) Although Defendant was in a psychiatric ward when he was interviewed, there was no evidence that he was not acting rationally or was incapable of appreciating the consequences of his actions.

Where a person's conduct shows that he has a reasonable appreciation of the nature and significance of his actions or a capacity to make autonomous decisions, the mere indication that he may also be suffering from some form of mental disease or defect does not make him incapable of giving a voluntary consent to a search. *See Vinton*, 631 F.3d at 482 (concluding that lower-than-average intelligence is relevant to the question of voluntariness, but that the defendant's borderline IQ and history of drug abuse did not require a finding of involuntariness when the defendant was intelligent enough to understand his constitutional rights); *United States v. Gipp*, 147 F.3d 680, 685–86 (8th Cir. 1998) (concluding that consent was voluntary despite the defendant's assertion that he was intoxicated and that the officer's approach of his car exacerbated his post-traumatic stress disorder where the defendant's conduct included answering questions intelligently and behaving rationally); *see also United States v. Hall*, 969 F.2d 1102, 1107–08 (D.C. Cir. 1992) (concluding that consent was voluntary despite the defendant's IQ in the range of low-average to mild mental retardation where her conduct showed "a capacity to make autonomous decisions"). Here, Defendant's conduct, described above, showed that he had a reasonable

appreciation of the nature and significance of his consent to search his residence.

Further, although Defendant argues that the FBI agents should have repeated *Miranda* warnings prior to obtaining Defendant's consent at the end of their first interview with him, *Miranda* warnings are not required before an officer requests consent to search, and the absence of such warnings does not make an otherwise valid consent involuntary. *See United States v. Payne*, 119 F.3d 637, 643 (8th Cir. 1997). And the FBI agents informed Defendant of his *Miranda* rights at the outset of the interview that concluded with Defendant's execution of the consent form. *United States v. Lee*, 356 F.3d 831, 834 (8th Cir. 2003) (providing *Miranda* warnings "can lessen the probability that a defendant was subtly coerced" into consenting). More importantly, although they were not required to do so, the FBI agents also informed Defendant that he had a right to refuse to give his consent to the search of his home. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 231–32 (1973) (concluding that advice of the right to refuse consent is not a prerequisite to obtaining voluntary consent to search). The FBI agents' failure to repeat *Miranda* warnings before obtaining his signature on the Consent to Search form does not render Defendant's consent involuntary, and, in fact, the agents advice of rights prior to obtaining consent exceeded that which they were constitutionally required to provide.

## C. The Second Search

In his memorandum in support of his motion to suppress, Defendant does not clearly distinguish between the first search and the second search on January 2, 2013. In the latter, the FBI agents discovered the gun that the Government will attempt to use against Defendant at trial to prove that he committed the charged offense. Defendant does argue that the homeowner's consent in this case could not justify the warrantless search of the basement because the homeowner did not have actual authority over the area searched and there is "no dispute that the [Defendant] resided in a basement apartment of the house in question." (Def.'s Mem. 5.) The Court construes this argument to refer to the second search in which the agents found the .38 caliber revolver at issue.

So construed, Defendant's argument ignores the fact that a third party who has common authority over shared premises can validly consent to a search, and that even if she does not have common authority, law enforcement may reasonably rely on indicia suggesting the consenting party did have such authority. *See Illinois v. Rodriquez*, 497 U.S. 177, 188 (1990) (holding that a warrantless entry of a house may be reasonable based on apparent authority of a third party to consent to its search). Law enforcement officials are entitled to form impressions from context in determining whether a third party has authority to consent to a search. *See United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) (noting that the Eighth Circuit has been liberal about

12

allowing police to draw conclusions about a third party's authority to consent and citing several illustrative cases).

Here, based on the totality of the circumstances, the FBI agents reasonably relied on the homeowner's actual or apparent authority to consent to the search of the area above the ceiling panels in the basement. First, the third party who consented to this second search had already, during the first search, granted the FBI agents access to the basement where Defendant resided once. It was reasonable for the agents to conclude that she had authority to permit them to enter that area to search it a second time. Second, when the FBI agents first met with Defendant, he expressed a desire that they contact the homeowner to obtain her consent to search his basement bedroom. Conditioning his consent on the consent of the third party homeowner strongly suggests that the homeowner maintained some "mutual use, joint access, and control" over the basement. *See United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) (noting that common authority over premises is determined by the existence of mutual use, joint access, and control). And finally, the fact that the third party giving consent here owned the home in question supports this Court's conclusion that she either had actual common authority over the basement area or that the FBI agents reasonably relied on evidence suggesting that she had such authority. While ownership of a home does not rule out the possibility that Defendant had reached a tenancy arrangement with the homeowner that gave him exclusive control over the basement area, her ownership is consistent with

13

the other evidence indicating that the homeowner did maintain some control over the basement area of the home. *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (stating that the consent of a third party who "possesse[s] common authority over" the premises to be searched or who has a "sufficient relationship to the premises or effects" is sufficient to authorize a warrantless search); *United States v. Nichols*, 574 F.3d 633, 636–37 (8th Cir. 2009) (concluding that the third party's conduct in explaining her relationship with the defendant, freely operating a computer to show the officers what was on it, and appearing familiar with the home gave the officers a reasonable belief that she was capable of granting consent as an occupant of shared premises). Accordingly, the FBI agents' second search of the basement apartment on January 2, 2013, did not violate Defendant's Fourth Amendment rights.

### D. Conclusion

For all the foregoing reasons, this Court concludes that Defendant's Fourth Amendment rights were not violated by either January 2, 2013 search of his basement apartment because each was justified by either Defendant or the homeowner's voluntary consent. Accordingly, this Court concludes Defendant's motion to suppress evidence seized from his apartment must be denied.

## II. Defendant's Motion to Suppress Statements

### A. Legal Standard

Defendant also moves to suppress the statements he made to the FBI agents on January 2, 2013, at Regions Hospital and on January 4, 2013, at the

14

Ramsey County Jail. Defendant argues that these statements cannot be used against him at trial because his mental state at the time the statements were made prevented him from knowingly and intelligently waiving his *Miranda* rights. (Def.'s Mem. 1–4.) The Government contends that the Defendant validly waived his *Miranda* rights because he had sufficient capacity to do so. (Doc. No. 33, Gov't's Resp. to Def.'s Mots. to Suppress ("Gov't's Mem.") 4–6.)

Generally, because the Fifth Amendment protects a person's right not to be compelled to incriminate himself, the government cannot use an individual's statements against him at trial if those statements were made during a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966). However, if the government provides a proper *Miranda* warning prior to a custodial interrogation, and an individual waives his *Miranda* rights knowingly, intelligently, and voluntarily, that person's statements may be used against him at trial. *See Vinton*, 631 F.3d at 483. For the statements to be used against him, a defendant's waiver "'must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Moran*, 475 U.S. at 421). In addition, the defendant "must have waived his rights 'with a full awareness of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran*, 475 U.S. at 421). To decide whether a purported waiver of rights is knowing, intelligent, and voluntary, courts consider the totality of the circumstances. *Id.* The Government bears the burden of showing the validity of the *Miranda* waiver

15

by a preponderance of the evidence. *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

### B. Analysis

On the first prong of the waiver analysis, the evidence in the record demonstrates there was no intimidation, coercion, or threatening by the FBI agents prior to or during Defendant's questioning at Regions Hospital or at the Ramsey County Jail. It shows that, on both occasions, Defendant spoke willingly to Special Agent Walden after he signed the Consent to Search form. The atmosphere of both interviews was cooperative and calm. These facts show that Defendant's waiver was the product of his free and deliberate choice to speak with the FBI agents rather than any intimidation, coercion, or deception.

The preponderance of the evidence also shows that Defendant provided the waiver with full awareness of the right being abandoned and the consequences of the decision to abandon it. Defendant informed the FBI agents that he understood the rights that Special Agent Walden read to him from the FBI's Advice of Rights form on the occasion of both interviews. (Gov't's Hr'g Exs. 3–4.) There is no evidence that Defendant exhibited any inability to understand his rights as they were read to him by Special Agent Walden or the consequences of deciding to continue the interview.

Defendant contends that his diminished mental capacity, and the Special Agent Walden's failure to investigate Defendant's mental state more fully, prevented Defendant from making a knowing, intelligent, and voluntary waiver of

16

his *Miranda* rights. However, "[e]ven if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect . . . a *Miranda* waiver will not be invalidated on that basis if there is no evidence of police coercion." *Vinton*, 631 F.3d at 483. As discussed above, there is no evidence in the record that any law enforcement coercion occurred here. And as this Court described in connection with Defendant's motion to suppress, the evidence that Defendant has any diminished capacity is itself inconclusive and rebutted by Defendant's ability to interact with the FBI agents in a rational and logical fashion.

With respect to Defendant's argument that Special Agent Walden should have done more to determine whether Defendant's mental capacity reduced his ability to give valid consent, the evidence at the hearing showed that although Defendant had been admitted to the psychiatric ward at Regions Hospital before the first interview, all the information available to the FBI agents suggested that Defendant had sufficient capacity to give valid consent. Other than referring to the hospital records, Defendant presented no evidence – by expert testimony or otherwise – that he was not capable of voluntarily waiving his *Miranda* rights. And given the Government's showing that Defendant was able to understand both the rights he was advised of and the consequences of agreeing to talk to the agents about the robbery, the absence of any such evidence is fatal to Defendant's motion to suppress his statements. Further, the law does not require a government agent to conduct an exhaustive investigation into a suspect's mental state before obtaining a valid waiver of his *Miranda* rights. *See,*

*e.g.*, *United States v. Perez*, No. CR. 08-50033-KES, 2009 WL363618, at *10 (D.S.D. Feb. 12, 2009) (noting the absence of any authority that a government agent has a duty to perform testing of the defendant to rule out whether the defendant was intellectually impaired, under the influence of a chemical substance or sleep-deprived for a waiver of *Miranda* rights to be valid "particularly where . . . there was no outward indication that [the defendant] was impaired in any way"). Thus, using Defendant's statements against him at trial will not violate his Fifth Amendment rights.

### C. Conclusion

For all the foregoing reasons, and based on the preponderance of the evidence, this Court concludes that Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, and his motion to suppress statements must be denied.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress the Fruits of an Unlawful Search and Arrest (Doc. No. 23), be **DENIED**; and

2. Defendant's Motion to Suppress Statements (Doc. No. 24), be **DENIED**.

Dated:  March 26, 2013

                                               *s/ Jeffrey J. Keyes*
                                               JEFFREY J. KEYES
                                               United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 9, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen** days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

      Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.